IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 14, 2008 Session

**JOSEPH VERMEAL v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Warren County**
**Nos. F-8351, F-8405     Larry B. Stanley, Jr., Judge**

---

**No. M2007-01676-CCA-R3-PC - Filed July 3, 2008**

---

A Warren County jury convicted the Petitioner of aggravated sexual battery and attempted aggravated sexual battery in separate cases, and this Court affirmed the judgments on appeal. The Petitioner filed two post-conviction petitions asserting various grounds for relief. The post-conviction court denied the petitions for post-conviction relief after a consolidated hearing. On appeal, the Petitioner alleges: (1) he was denied the right to a fair trial because a case relied upon by the trial court and on direct appeal to exclude expert testimony proffered by the Petitioner has since been overturned; and (2) he was denied the effective assistance of counsel. After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which J.C. MCLIN and D. KELLY THOMAS, JR., JJ., joined.

Lynn Brooks (at hearing), McMinnville, Tennessee, and Michael Meise (on appeal), Dickson, Tennessee, for the Appellant, Joseph Vermeal.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Andrew Hamilton Smith, Assistant Attorney General; David Puckett, District Attorney General Pro Tem, for the Appellee, the State of Tennessee.

**OPINION**

**I. Facts**

Originating from separate cases and trials, the facts underlying this appeal are set forth in two opinions from this Court. The facts of the first case (hereinafter "*Vermeal I*") are as follows:

The appellant was indicted by the Warren County Grand Jury for rape of a child. In the light most favorable to the State, the proof adduced at trial revealed that on August 26, 2000, Pioneer Community Baptist Church sponsored a block party in the parking lot of nearby Country Place Apartments. The party began at 10:00 a.m. and lasted until 2:00 p.m. During the party, John Thompson, the pastor of the church, saw the appellant on his porch at the apartment complex. Thompson introduced himself to the appellant, and the two men spoke briefly. Thompson observed that the appellant was drinking beer, but he did not appear intoxicated. Later, Thompson saw the appellant standing near a dunking machine that had been set up for the party. Thompson stated that a number of children were taking turns going into the water. Thompson saw a child enter the appellant's apartment and exit with towels. The appellant distributed these towels to the wet children. Throughout the party, Thompson saw children going into and leaving the appellant's apartment.

After the party ended, the victim, JP, and her friend, [NO], both of whom were eight years old, rode their bicycles with some friends. One of the other children told [NO] that they could obtain ice cream at the appellant's apartment. The children went to the appellant's apartment and found that the appellant was home. The children got popsicles from the appellant's freezer, and ate them on the appellant's front porch. Afterward, the children went inside the appellant's apartment to watch television and jump on the appellant's waterbed. Soon, all of the children except [NO] and JP went home.

At trial, [NO] recalled that she was in the living room while JP was jumping on the appellant's bed. The appellant went into the bedroom. Orcutt looked into the bedroom and saw that the appellant "had taken some of [JP's] clothes off and his pants and had his, um, private part to her private part." JP testified that the appellant knocked her onto the bed, removed her pants and underwear, removed his own pants and underwear, and penetrated her vagina with his penis. After the incident, the children left the appellant's apartment.

Charles Ikeard, who testified for the appellant, remembered going to the appellant's apartment after the block party. He saw that [NO] and JP were playing on the appellant's bed. Ikeard told the appellant that "it didn't look good" that the girls were in the apartment with the appellant. Then, Ikeard told the children to go home. Ikeard also informed the children's parents of the girls' location.

Howard Orcutt, [NO]'s father, stated that on the night of the offense he was told that his daughter was in the appellant's apartment. After receiving the information, Mr. Orcutt approached the appellant, who was on his porch. Mr. Orcutt confronted the appellant, asking why his daughter had been in the appellant's apartment. The appellant pushed Mr. Orcutt. Then, Mr. Orcutt "put him in the hospital," beating the appellant so severely that an ambulance was called.

2

[NO] and JP were taken to the District Attorney General's Office for questioning. Initially, the children denied that anything had happened. However, almost immediately thereafter, JP stated that the appellant abused her after plying her with liquor and threatening her with a knife. At trial, JP explained that she manufactured these additional details due to her fear that she would get in trouble with her mother because she was not supposed to be in the appellant's apartment, and she just wanted the ordeal to be over. [NO] also explained that her previous statements may have contained inconsistencies because she was "freaked out" by the incident and "now I can remember everything that happened because I ain't that scared."

At the conclusion of the proof, the jury acquitted the appellant of the charged offense but found him guilty of the lesser-included offense of aggravated sexual battery. The trial court imposed a sentence of nine years.

*State v. Joseph Vermeal*, No. M2004-00046-CCA-R3-CD, 2005 WL 1000237, at *1-2 (Tenn. Crim. App., at Nashville, Apr. 29, 2005), *perm. app. denied* (Tenn. Oct. 24, 2005). The facts of the second case (hereinafter "*Vermeal II*") are as follows:

The appellant was indicted by the Warren County Grand Jury on one count of aggravated sexual battery. In the light most favorable to the State, the proof adduced at trial revealed that on August 26, 2000, Pioneer Baptist Church sponsored a block party in the parking lot of the nearby Country Place Apartments. After the party ended, the victim, N.O., who was seven years old, rode her bicycle with several friends. The victim was dressed in blue jeans and a Tweety Bird shirt. One of the other children told the victim that they could obtain ice cream at the appellant's apartment. The children went to the appellant's apartment and found that the appellant was at home, sitting on the porch. After receiving the appellant's permission, the children went inside and got popsicles from the appellant's freezer. At the appellant's request, the children ate their popsicles on the appellant's front porch instead of inside his apartment. Afterward, the children went inside the appellant's apartment to watch television and jump on the appellant's waterbed.

Soon, all of the children except the victim and J.P., another female child, went home. The victim remained in the appellant's living room for thirty minutes to an hour, watching cartoons on cable television, while J.P. went in the appellant's bedroom to jump on the bed. The appellant joined J.P. in the bedroom. Some time after the appellant went into the bedroom, the victim was standing by the front door looking outside when she felt someone touch her right buttock. During her testimony at trial, the victim demonstrated how she was touched. The victim believed that J.P. had touched her, but when she turned around she saw the appellant. The appellant slid his hand underneath her shirt and touched her breasts. She explained that when he touched her, "he . . . pressed down." The appellant removed his hand, got a beer from the kitchen, and returned to the bedroom.

3

The victim was afraid that she would get into trouble for being in the appellant's apartment and for letting him touch her. She remained in the apartment for a few minutes then went outside. She rode her bike for ten minutes before being stopped by "Uncle E.J.," Elvis Joseph Kersey. Kersey told the victim that one of his friends had seen her in the appellant's apartment. The victim did not tell Kersey what the appellant had done because she was embarrassed and did not want to discuss the incident. Kersey and the victim went to find the victim's dad, Howard Orcutt. Both Kersey and Orcutt lived in Country Place Apartments.

When the victim and Kersey found Orcutt at his apartment, Kersey told Orcutt that the victim had been in the appellant's apartment. Orcutt left, going immediately to the appellant's apartment. He found the appellant sitting on the porch of his apartment. Orcutt stepped on the appellant's porch and asked the appellant why his daughter had been in the appellant's apartment. The appellant grabbed Orcutt's neck and pushed him. A scuffle ensued with Orcutt emerging as the victor.

Upon his return to his apartment, Orcutt found the victim sitting on the porch with her grandmother, Barbara Bevilagua. The victim was crying. Bevilagua asked the victim if the appellant had touched her. Initially, the victim stated that he had not; however, shortly thereafter she acknowledged that the appellant had touched her. When asked where the appellant touched her, the victim, who was sitting down, gestured below her waist. Orcutt went back to the appellant's apartment, intending to kill him. However, police had been called as a result of the previous struggle. The appellant was taken from the scene in an ambulance.

The victim was taken to the Department of Children's Services (DCS) where she was interviewed by a case worker, Melba Mooneyham. The victim initially told Mooneyham that nothing happened at the appellant's apartment. At trial, the victim explained that at the time of the first statement, she had not wanted to discuss the incident because she was embarrassed, frightened, and believed she would get in trouble for being in a stranger's apartment. At a second interview with Mooneyham on October 10, the victim told Mooneyham about the details of the molestation. Mooneyham believed that the victim was more comfortable with her and forthright during the second interview.

At the conclusion of the proof, the jury acquitted the appellant of the charged offense but found him guilty of the lesser-included offense of attempted aggravated sexual battery. The trial court imposed a sentence of four years. The court ordered that the sentence for the instant offense be served consecutively to the nine-year sentence he had previously received for the aggravated sexual battery of J.P.

*State v. Joseph Vermeal*, No. M2005-00568-CCA-R3-CD, 2005 WL 3543417, at *1-2 (Tenn. Crim.

4

App., at Nashville, Dec. 28, 2005), *perm. app. granted* (Tenn. June 5, 2006). Of importance on this appeal is the Petitioner's proffer of his excluded expert's proposed testimony:

> Dr. Bernet testified that he was a graduate of Harvard Medical School and was board certified "in general psychiatry and in child and adolescent psychiatry and in forensic psychiatry." Dr. Bernet asserted that his testimony would relate to three issues. First, he would explain to the jury "the proper methods for interviewing children in investigating allegations of maltreatment." Second, he would discuss "the various mechanisms, psychological mechanisms, by which false statements are made by children." Finally, he would testify regarding "what has been studied in research with children in these situations and to be able to explain or to list different factors that are consistent with true allegations and different factors that are consistent with false allegations of abuse."
>
> As an example, Dr. Bernet explained that he would inform the jury that asking a potential child sexual abuse victim suggestive, leading, or repetitive questions was ill-advised. Dr. Bernet, had "reviewed the interview" of the DCS worker and JP and concluded that JP had been asked questions which influenced the answers she gave. Dr. Bernet also noted that there were indications in JP's previous statements which suggested that the allegations were true, and there were other indications which would suggest the allegations were false. Dr. Bernet stated that his testimony would serve to aid the jury in determining the credibility of the statements of the child witnesses and "help them be aware of issues they need to be aware of."

*Vermeal I*, 2005 WL 1000237, at *5; *Vermeal II*, 2005 WL 3543417, at *5.

In *Vermeal I*, the Petitioner challenged the sufficiency of the evidence and the trial court's exclusion of his expert witness. *Id.* at *5-7. This Court noted that the trial court excluded the expert witness because the "testimony did not meet the standard of reliability announced in *McDaniel* and would not substantially assist the trier of fact . . . as required by Rule 702." *Id*. at *5. Additionally, this Court recognized that "the [trial] court relied upon *State v. Coley*, 32 S.W.3d 831 (Tenn. 2000), which [ ] provided for the exclusion of expert testimony generalizing the unreliability of eyewitness testimony." *Id*. In our analysis, we examined the case under *McDaniel* and Rule 702, and with assistance from *Coley* and *State v. Howard Walter Thomas*, No. E2003-02090-CCA-R3-CD, 2005 WL 735040 (Tenn. Crim. App., at Knoxville, Mar. 30, 2005), *perm. app. denied* (Tenn. Oct. 10, 2005), we concluded that the trial court did not err in excluding the testimony because the expert's "testimony was geared toward assessing the credibility of child witnesses." *Vermeal I*, 2005 WL 1000237, at *7. This Court, thus, affirmed the judgment of the trial court. *Id*.

In *Vermeal II*, the Petitioner challenged the sufficiency of the evidence, his sentence, and the trial court's exclusion of his expert witness. *Vermeal II*, 2005 WL 3543417, at *2-8. As a basis for excluding the witness, the trial court found the Petitioner's late notice "did not allow the State 'a proper opportunity to prepare for the witness's testimony and the witness's testimony must therefore be excluded.'" *Id*. at *4. Additionally, the trial court concluded that the testimony did not meet the

5

requirements of Rule 702. *Id*. In an analysis similar to that of *Vermeal I*, this Court concluded the trial court did not err in excluding the expert witness because "the testimony of Dr. Bernet regarding the interviewing techniques of alleged child sexual abuse victims is akin to that proposed in *Coley*." *Id.* at *6. This Court, thus, affirmed the judgment of the trial court. *Id.* at *8.

The Petitioner then filed a petition for post-conviction relief on his *Vermeal I* conviction on January 30, 2006, and was appointed counsel four days later. The petitioner filed a petition in *Vermeal II* on September 25, 2006, and an amended petition on November 26, 2006. The post-conviction court ultimately consolidated the petitions and held a hearing on May 31, 2007. The following evidence was presented at that hearing: The Petitioner testified that Lisa Zavogiannis represented him in *Vermeal I*. His first trial resulted in a hung jury, but a jury convicted him after a re-trial. Addressing the claims he presented in his petition for post-conviction relief, the Petitioner stated that he felt he was denied the right to present a defense because the trial court prevented him from calling an expert witness. Additionally, the Petitioner felt that counsel was ineffective because she failed to photograph the scene the scene of the crime, which could have been used to impeach witnesses.[1]

Addressing *Vermeal II*, the Petitioner also complained that he failed to receive the effective assistance of counsel from Phillip Clemons, who was his counsel in that case. Specifically, he stated that counsel failed to call to testify Martha Morris and A.J. Ikeard and failed to meet with him until the day of trial. Additionally, the Petitioner testified that counsel elicited detrimental testimony from a witness that had been previously excluded by a motion in limine and failed to object to leading questions of the victim.

On cross-examination, the Petitioner admitted that Clemons assisted Zavogiannis in *Vermeal I*. Although Clemons visited him and discussed the evidence during the first trial, Clemons did not visit him until the day of trial in *Vermeal II*. The Petitioner stated that Clemons was "very familiar" with the case because of his previous work. In addressing the complaints specifically in *Vermeal I*, the Petitioner admitted that, although Zavogiannis did not introduce a photograph of the scene to rebut testimony, she introduced a diagram. The Petitioner also stated that counsel cross-examined the victims with their previous inconsistent statements. Additionally, the Petitioner admitted that the trial court excluded the testimony of Dr. Bernet, and this Court affirmed that decision.

Lisa Zavogiannis testified that she prepared a diagram of the apartment instead of using pictures for two reasons: first, because the Petitioner's apartment was under construction; and, second, because pictures taken of an identical apartment did not show the apartment as it looked on the day in question.

Phillip Clemons, the Petitioner's counsel in *Vermeal II*, testified that the Petitioner mentioned calling Martha Morris to testify, but Clemons concluded that she would not be beneficial to his case. With respect to A.J. Ikeard, Clemons stated that Ikeard had a prior criminal history, and he believed

---

[1]Testimony concerning allegations of ineffectiveness not asserted on appeal has been omitted.

the jury would not have found Ikeard credible. In addressing the Petitioner's claim that Clemons did not visit him prior to the second trial, Clemons stated that he felt as though he knew the case because he assisted on the first case. He visited the Petitioner in jail before the first trial and discussed trial strategy with him. Clemons determined that further visits would not help his preparation. Clemons admitted it was possible that he did not visit the Petitioner prior to the second trial.

In addressing the testimony solicited from a detective, Clemons testified that he moved to exclude evidence found in the Petitioner's apartment prior to trial. At trial, he called Derwin Adcock from the McMinnville Police Department to testify about what was not found in the Petitioner's apartment. Clemons stated that he performed research about what pedophiles usually have in their bedrooms, and Adcock testified that the Petitioner did not have many or most of these things. Clemons admitted that the jury could view the things found in the Petitioner's bedroom – a child's book, children's clothes, a video, and a knife – against the Petitioner, but he stated he made a tactical choice. Clemons also stated that he did not feel questions or statements by the State vouched for the credibility of witnesses. Additionally, if anything was objectionable, Clemons decided not to object as trial strategy.

On cross-examination, Clemons testified that he had been to the jail with Zavogiannis, met with the Petitioner on many occasions, and sat through the first trial. He was aware of the witnesses' and victim's testimony, and he had copies of the trial transcripts and the preliminary hearing transcripts. Clemons requested money to hire Dr. Bernet, but the trial court denied that request.

Martha Morris testified that she knew the Petitioner for six months before the incidents underlying this case. She saw the Defendant at least three times a week and every other weekend because she dated the Petitioner's neighbor, Modglin. Morris stated that, a week before the incidents, the Petitioner invited her and Modglin to a barbeque where the victims were present. The Petitioner allowed the children to play while he visited with the other adults present.

On cross-examination, Morris admitted she did not know the victims' names. She stated they were "dark-headed, small" but, in that age group, "they all look alike." Morris admitted she never mentioned the children to Zavogiannis or Clemons.

After hearing argument, the post-conviction court concluded that the expert witness issue had already been raised and ruled upon by this Court. Additionally, the court found the Petitioner failed to prove Zavogiannis was deficient or that any alleged deficiencies prejudiced the Petitioner. Although the post-conviction court found that Clemons should have met with the Petitioner prior to trial, the court concluded that the Petitioner did not prove prejudice because of Clemons's failure to meet with him. The post-conviction court determined that the other issues raised by the Petitioner were matters of trial strategy not to be judged in hindsight. The post-conviction court denied the petition for post-conviction relief, and it is from this decision that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner presents two arguments: (1) that, because *State v. Copeland*

overrulled *State v. Coley*, the case used by the trial court and this Court to exclude the expert testimony, the Petitioner's due process right to a fair trial was violated when his expert was excluded; and (2) that he did not receive the effective assistance of counsel. We will address each issue in turn.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

### A. Right to a Fair Trial

The Petitioner's first claim is based on the fact that, on May 23, 2007, the Tennessee Supreme Court, in *State v. Copeland*, overturned *State v. Coley. See State v. Copeland*, 226 S.W.3d 287, 300 (Tenn. 2007). Before addressing the issue on the merits, however, we must first address the State's argument that the Petitioner has waived this claim by not presenting it to the post-conviction court. The State's argument is premised on the fact that *Copeland* was decided before the post-conviction hearing, albeit only eight days before. We recognize that the petition for post-conviction relief would be unlikely to contain a *Copeland* argument as *Copeland* had not yet been decided, but the post-conviction attorney failed to raise the issue at the hearing. Instead, post-conviction counsel simply presented a relatively straight-forward argument on the merits of this Court's decision on direct appeal. Accordingly, the post-conviction court dismissed the claim because we had already ruled upon that issue.

The statutes on post-conviction relief, located at Tennessee Code Annotated section 40-30-106, describe the rule on waiver as it relates to a petition for post-conviction relief:

(g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or

> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Because the Petitioner failed to present this claim to the post-conviction court, "a court of competent jurisdiction in which the ground could have been presented," and because neither exception applied to the Petitioner, the Petitioner has risked waiver of the *Copeland* issue. Despite this risk of waiver, we will continue with our analysis. *See Swanson v. State*, 749 S.W.2d 731, 736 (Tenn. 1988) ("[A] mechanical application of the law, without any recognition of the interval that is necessary for a previously unrecognized rule of law to be applied in practice, defeats the purpose of the [Post-Conviction] Act, divorcing the case form reality and putting form above substance.").[2]

The main thrust of Petitioner's claim is that, because the Tennessee Supreme Court has overruled the case upon which the trial court and this Court partially relied to exclude the testimony of his expert, he is entitled to relief. This argument presupposes that *Copeland* is retroactive.

*Coley* generally held that a trial court could exclude an expert on eyewitness identification because such testimony did not substantially assist the jury. *See State v. Coley*, 32 S.W.3d 831, 838 (Tenn. 2000). The Supreme Court's rationale for this rule was that the jury was responsible for making credibility determinations, and expert testimony on eyewitness reliability was therefore not necessary. *Id.* In this case, the trial court cited *Coley* when excluding the Petitioner's expert witness who would have testified that certain leading questions can elicit certain answers. This Court affirmed that decision on appeal. *See Vermeal I*, 2005 WL 1000237, at *7; *Vermeal II*, 2005 WL 3543417, at *6. On May 23, 2007, after the Petitioner filed his petition for post-conviction relief but before the hearing on the petition, the Tennessee Supreme Court overruled *Coley* and instructed that experts on eyewitness testimony may be allowed to testify about the unreliability of eyewitness accounts. *Copeland*, 226 S.W.3d at 300.

Thus, the question is whether the Petitioner may invoke *Copeland* to assist him in his petition for post-conviction relief. In support of his position, the Petitioner cites *Pruett v. State*, 501 S.W.2d 807 (Tenn. 1973), and *Swanson v. State*, 749 S.W.2d 731 (Tenn. 1988). We view *Pruett* as more on point with this case.[3] In *Pruett*, the post-conviction petitioner was convicted of burglary. *Pruett*, 501 S.W.2d at 808. In his post-conviction petition, heard in October 1972, he failed to allege double jeopardy because a constitutional rule applicable to his situation had not been given retroactive

---

[2]While we have considered remanding the case in order to allow the post-conviction court to address the *Copeland* argument, we conclude that is not necessary in this case because *Copeland*, as further explained, is not retroactively applicable to the Petitioner's case.

[3]In *Swanson v. State*, the petitioner had been convicted in January 1981 of first degree murder under the rule that presumed all homicides were malicious. 749 S.W.2d at 732. Prior to his trial, the United States Supreme Court had concluded that such an instruction was unconstitutional. *Id.*; *see Sandstrom v. Montana*, 442 U.S. 510, (1979). The petitioner in *Swanson* did not raise a *Sandstrom* issue until his second petition for post-conviction relief. *Swanson*, 749 S.W.2d at 732-33. This court remanded the case to the post-conviction court for a determination of whether the petitioner waived his *Sandstrom* argument by failing to raise it in his first petition for post-conviction relief, and the Tennessee Supreme Court affirmed this Court's decision to remand. *Id.* at 733.

9

effect. *Id*. Once the rule was given retroactive effect, in January 1973, the petitioner raised the issue in this Court. *Id*. We remanded for further proceedings, and the Tennessee Supreme Court upheld that decision. *Id*. at 810. In our view, in order to apply *Pruett*, *Copeland* must be retroactive.

In general, new rules of *constitutional* law are given retroactive effect. *See Van Tran v. State*, 66 S.W.3d 790, 810-11 (Tenn. 2001) ("'a new state constitutional rule is to be retroactively applied to a claim for post-conviction relief if the new rule materially enhances the integrity and reliability of the fact finding process of the trial.') (quoting *Meadows v. State*, 849 S.W.2d 748, 755 (Tenn. 1993) and citing T.C.A. § 40-30-222 (1997)). Because the rule in *Copeland* is an evidentiary issue, not a constitutional issue, it does not fall under the constitutional law rule.

Although we have been able to locate case law in which a defendant asserts that a new rule of evidence should not be applied to him because the crime was committed prior to the enactment of rule, we have had considerable difficulty locating any case where a defendant, on collateral review, attempts to assert that a new rule of evidence that works to his benefit and established after his trial should be retroactively applied to his trial.

The most closely related issue is ex post facto, such as that addressed in *State v. Bragan*. In *State v. Bragan*, this Court addressed the change in the evidentiary rule concerning spousal competency. 920 S.W.2d 227, 240-41 (Tenn. Crim. App.1995). At the time of the crime in *Bragan*, either the testifying spouse or the non-testifying spouse could invoke the privilege. *Id*. at 240. At the time of trial, however, the rule had been changed to allow only the testifying spouse to invoke the privilege. *Id*. at 240. In an ex post facto analysis, this Court held that a trial applying the new rule was constitutionally permissible. *Id.* at 241 ("[L]aws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws."). *See generally Hopt v. Territory of Utah*, 110 U.S. 574, 589 (1884) (concluding that a Utah law which changed the previous rule that no convicted felon could testify in a criminal case was not an ex post facto law).

It has been generalized by the Pennsylvania Supreme Court that there are four approaches to retroactivity:

> One approach is to give the new rule purely prospective effect so that it is not even applied to the parties in the case in which the new rule is announced. Another approach is to limit retroactive application to the case in which it is announced. A third choice is to apply the new rule to the case in which it is announced and to all cases pending at the time the new rule is announced. A fourth approach is to give the new rule fully retroactive effect. Under this fourth choice, the new rule is applied to the case in which it is announced, to all cases pending at the time the new rule is announced, and to cases which are final at the time the new rule is announced.

*Blackwell v. Pennsylvania*, 589 A.2d 1094, 1099 (1991) (internal citations omitted). The Petitioner would urge us to apply approach four.

10

In our search to find applicable law as to which approach is applicable to this situation, we found that the Massachusetts Supreme Court specifically stated that a new common law rule of evidence is to be applied to the case in which it was decided on remand and, subsequent to that, only prospectively. *Massachusetts v. Adjutant*, 824 N.E.2d 1, 15 (Mass. 2005). This would utilize approach two. Approach two is sound in this case: if we were to grant *Copeland* retroactive application to cases on collateral appeal, every defendant whose case presented a *Coley* issue and was decided under *Coley* would, arguably, be entitled to a new trial. Such an application could potentially disrupt many long-since settled cases and place an enormous burden on courts. Further the idea could be applied to any number of other issues, thereby rendering final judgments temporary. The Petitioner has presented no authority, and we can find no authority, mandating or suggesting this outcome. We conclude that, because *Copeland* does not apply to the Petitioner on his collateral appeal, he can not take advantage of it in arguing he was denied the right to a fair trial. Therefore, this issue has already been decided on direct appeal, and the post-conviction court was not in error to deny relief.

## B. Ineffective Assistance of Counsel

The Petitioner asserts that both Zavogiannis and Clemons were ineffective in cases F-8351 and F-8405. We will address each case in turn. The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge

11

the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Case Number F-8351

In this case, the Petitioner alleges that Zavogiannis was ineffective in failing to use photographs of the apartment and in failing to impeach the victim's testimony with her grand jury testimony. At the post-conviction hearing, Zavogiannis testified that she was the second attorney appointed to represent the Petitioner, and her representation began one year after the incidents occurred in this case. Because the Petitioner's actual apartment was under construction when she was appointed to represent him, she was unable to accurately recreate the inside of the apartment for a photograph. Therefore, Zavogiannis testified, she utilized a diagram of the apartment. The post-conviction court determined that Zavogiannis was not deficient, and we agree.

With respect to the victim's grand jury testimony, Zavogiannis testified that the State told her no grand jury transcript was available. The Petitioner argues, though, that Zavogiannis could have used Tennessee Rule of Criminal Procedure 6(k)(2), an exception to grand jury secrecy, to obtain the testimony. Even assuming that Zavogiannis could have obtain the grand jury testimony of the victim, the Petitioner has not presented the testimony here on his post-conviction appeal. Therefore, we cannot conclude that the Petitioner was prejudiced by Zavogiannis's failure to obtain grand jury testimony. *See Owens v. State*, 13 S.W.3d 742, 746 (Tenn. Crim. App. 1999). He is not

entitled to relief on this issue.

## 2. Case Number F-8405

In this case, the Petitioner alleges Clemons was ineffective in failing to confer with him prior to the day of trial in *Vermeal II*, in failing to object to the State's use of leading questions during the victim's testimony, in calling a witness who gave detrimental testimony, and in failing to call Martha Morris and A.J. Ikeard.

The post-conviction court concluded that, although Clemons's lack of visitation with the Petitioner certainly left something to be desired, the Petitioner failed to prove he was prejudiced. We agree. Clemons assisted Zavogiannis in the first trial, visited the Petitioner in jail a number of times, interviewed witnesses, and discussed trial strategy that was somewhat successful in the first trial. Clemons testified that he felt he had sufficient knowledge to try the second case. The Petitioner has presented no evidence of how Clemons's lack of visitation affected his trial. Therefore, he has not proven the second prong of *Strickland*.

In addressing the State's use of leading questions, Clemons stated that he did not object as trial strategy and because he believed the questioning was permissible for a child victim. The post-conviction court found this decision was a matter of trial strategy, and we agree. Matters of trial strategy will not be second guessed on appeal if they are informed choices based on sound preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

With respect to the detective's testimony, Clemons testified that he performed research about the types of items usually found in pedophiles' rooms. Through the detective Clemons attempted to elicit testimony that most of those items were not found in the Petitioner's room. Clemons admitted that some of the items found in the Petitioner's room, as testified to by the detective, could be considered detrimental to the Petitioner's case, but he felt it was a tactical decision. These types of decisions will not be overturned on post-conviction. *Id*.

Finally, the Petitioner complains that Clemons failed to call two witnesses, Martha Morris and A.J. Ikeard. Clemons testified that he decided not to call Morris to testify because he did not want to open the door to the Petitioner's character. If he had called her to testify, the State would have been able to present additional witnesses that would testify about allegations of previous sexual assaults. In our view, Clemons could reasonably conclude that any benefit of Morris's testimony would be outweighed by negative consequences of opening the door to additional character witnesses. Similarly, Clemons considered the potential benefits of A.J. Ikeard, but determined that he would not provide any benefit to the Petitioner. We conclude that Clemons could reasonably determine that A.J. Ikeard's criminal past would render the credibility of his testimony suspect in the eyes of the jury and thus cloud the Petitioner's case. These are both matters of trial strategy that we will not second guess on appeal. *Id*. The Petitioner is not entitled to relief on this issue.

## III. Conclusion

13

After a thorough review of the record and applicable law, we conclude that the Petitioner is not entitled to post-conviction relief.  The judgment of the post-conviction court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE